BRIAN M. POMERANTZ (SBN 214264)
Law Offices of Brian M. Pomerantz
1710 East Franklin Street, #1040
Chapel Hill, NC 27514
Telephone: (323) 630-0049
Email: habeas@protonmail.com

ANN-KATHRYN TRIA (SBN 259138)
1801 Century Park East, 24th Floor
Los Angeles, California 90067
Telephone: (310) 201-2466
Email: aktria@proton.me

Attorneys for Plaintiff
MAURICE BOYETTE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURICE BOYETTE,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF ALAMEDA, a municipal organization, and JOHN DOES 1-20;<br><br>Defendant. | CASE NO. 4:26-cv-10520<br><br>**COMPLAINT FOR DAMAGES**<br>(42 U.S.C. §§ 1983 and 1988)<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Maurice Boyette, by and through his attorneys respectfully alleges as follows:

**INTRODUCTION**

1. For decades, and at least since 1980, the Alameda County District Attorney's Office ("ACDAO") has engaged in an unconstitutional pattern and practice of racial discrimination in jury selection, in violation of *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). The ACDAO has admitted to having engaged in this particular unconstitutional conduct in numerous capitally tried cases. Federal judges have also found *Batson* related violations in a number of Alameda County cases. As a result of the concession of structural error in his case, plaintiff Maurice Boyette ("Plaintiff" or "Mr. Boyette") has been released from custody.

2. The admitted violations against Plaintiff, and others, were not done in isolation by rogue prosecutors. Rather, the misconduct was the product of a deeply rooted unwritten administrative policy, custom, and/or practice—especially in capital cases—to keep Jewish and Black people from serving on juries. For decades, this widespread practice against Jewish potential jurors was ingrained in Alameda prosecutors based on the ACDAO's long-held belief that those of Jewish descent would be unwilling to send someone to the gas chamber—the method of execution utilized for nearly six decades before Plaintiff's trial. Plaintiff is informed and believes that Black jurors were targeted in all types of Alameda cases, not just capital ones.

3. To facilitate this unconstitutional practice—and to evade scrutiny—policymakers at the ACDAO made an administrative decision to intentionally fail to provide training, supervision, or instruction to employees regarding constitutional jury selection. The ACDAO also failed to address the misconduct of its employees, reflecting a deliberate indifference to Plaintiff's constitutional rights.

4. In 2024, prompted by the discovery of prosecutor juror notes in another Alameda County capital case (Ernest Dykes) which showed invidious racial

discrimination, United States District Judge Vince Chhabria found "strong evidence" of a "pattern of serious misconduct" and ordered disclosure of jury selection notes from all capital cases (approximately 62,000 pages), and review of 34 capital cases prosecuted by the ACDAO. Judge Chhabria's findings catalyzed exposure of a culture of invidious racial discrimination in jury selection that the ACDAO's final policymakers had previously spent decades concealing.

5. On April 22, 2024, then Alameda County District Attorney Pamela Price ("DA Price") publicly acknowledged her office's history of unconstitutionally striking Jewish and Black people from juries, stating, "[t]he evidence that we have uncovered suggests plainly that people did not receive a fair trial in Alameda County and as a result, we have to review all the files." DA Price further acknowledged that "[i]t's not limited to one or two prosecutors, but a variety of prosecutors," confirming that the practice was a widespread, recognized, and ratified custom of the ACDAO.

6. *Batson* violations in ACDAO cases go back at least as far as 1980, with the prosecution of David and Kenneth Moore by prosecutor James Anderson, who was the head of the capital unit at the time of Plaintiff's trial. In 2015, United States District Judge Lucy H. Koh granted habeas relief in a 1984 Alameda County capital case, based on *Batson* misconduct. *See Mitcham v. Davis*, 103 F. Supp. 3d 1091 (N.D. Cal. 2015). In *Mitcham*, which preceded Plaintiff's case by more than a decade, the "record makes clear that the prosecutor was keeping track of the race of the African American prospective jurors," writing "'B' next to their names on the qualified jury list" and giving them a "failing grade." *Mitcham v. Davis*, 103 F. Supp. 3d 1091, 1097 (N.D. Cal. 2015).

7. Judge Koh found that "the prosecutor intended to strike sixteen of the seventeen qualified African American jurors." *Id.* The prosecutor also made "handwritten notes during voir dire" of one Black prospective juror, stating "that she is 'Black' and that: 'She has some feelings about death penalty — but could

impose it in a given case. I think she would be alright but she does have some reservations about death — Keep if necessary to avoid *Wheeler* — She would try to be fair.'" *Id.*[1] Denoting jurors that could help avoid *Wheeler* objections is a practice seen elsewhere in Alameda prosecution notes over time. In Ernest Dykes' 1995 trial, a juror was identified as "*Wheeler* fodder."

8. Even after the ACDAO's conduct was made public in 2003, then District Attorney Tom Orloff, James Anderson (who DA Orloff delegated final capital case policymaking to), and the other policymakers therein sought to hide their conduct and continue the unconstitutional practice. Internal 2004 meeting notes disclosed by the ACDAO in 2024 reveal that when senior leadership was confronted with whistleblower allegations of systemic *Batson* violations, the ACDAO's final policymakers did not initiate corrective training or disciplinary oversight. Instead, the senior prosecutor in charge of investigating the claims coordinated a strategy to discredit the whistleblower and sanitize prosecution files of discriminatory jury selection materials. The affirmative decision to prioritize the preservation of unconstitutional convictions over constitutional mandates, evidences further formal ratification of the discriminatory practices, ensuring the custom remained the operational standard for ACDAO prosecutors.

9. Plaintiff has established a meritorious claim under 42 U.S.C. § 1983 and seeks justice for the immeasurable harm inflicted. There is no dispute that the ACDAO violated Plaintiff's constitutional rights—the ACDAO has admitted it. The ACDAO's unconstitutional conduct led to a death verdict that would not have been achieved via a constitutionally constructed jury. Not only would Plaintiff not have endured the specific hardships caused by death row versus general population incarceration, but he would also have been incarcerated for many fewer years than

---

[1] *People v. Wheeler*, 22 Cal. 3d 258, 272 (1978). *Wheeler* is the California equivalent of *Batson*. *Boyd v. Newland*, 467 F.3d 1139, 1142 n.2 (9th Cir. 2006).

he served.

10. The evidence shows that the errors were committed knowingly and not in isolation, but rather, borne from the product of a pattern and practice reinforced by those with supervisory and/or policymaking authority within the ACDAO.

11. This civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, seeks monetary damages for the extraordinary injuries and harm suffered by Plaintiff, who was wrongfully capitally charged, prosecuted, convicted, and imprisoned for more than 32 years—most of it on death row at San Quentin State Prison.

12. This lawsuit seeks to hold accountable the government entity which employed administrative policies, customs, and/or practices designed to systemically violate the constitutional rights of capital defendants in order to obtain convictions, and to recover from it compensation for Plaintiff's grievous injuries.

**PARTIES**

13. Plaintiff Maurice Boyette is a 53-year-old Black man currently residing in California. Mr. Boyette was released from custody on May 22, 2025, after 32 years, 9 months, and 23 days of incarceration.

14. Defendant County of Alameda ("County") is a municipal organization within the State of California. The Alameda County District Attorney's Office (previously defined as "ACDAO") is an agency of the County of Alameda, State of California, for whose torts the County is responsible. Defendants John Does 1-20 are final County policymakers who were aware of any alleged unconstitutional conduct and failed to take action.

**JURISDICTION, VENUE, AND CONDITIONS PRECEDENT**

15. This Court has jurisdiction under 28 U.S.C. § 1331 over claims arising under 42 U.S.C. §§ 1983 and 1988. This action arises under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983.

16. Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions, including the prosecution of Plaintiff in Alameda County and the damages he suffered from his Marin County death row incarceration, giving rise to these claims, occurred within this judicial district.

17. Divisional Assignment (Civil Local Rule 3-5) – Pursuant to Civil Local Rule 3-2(c), this action arises in Alameda County and/or Marin County, where substantial parts of the events or omissions giving rise to the claim and damages occurred. Pursuant to Civil Local Rule 3-2(d), assignment of this action to either the San Francisco or Oakland Division is proper.

18. The Government Claims Act does not apply to Plaintiff's federal claims. *Robinson v. Alameda Cnty.,* 875 F. Supp. 2d 1029, 1044 (N.D. Cal. 2012) ("The filing requirement does not apply to . . . causes of action based upon federal law."); *Conner v. Raver*, 2023 WL 5498728, at *4 (N.D. Cal. Aug. 24, 2023) ("Contrary to Defendants' argument, the Government Claims Act does not apply to Plaintiff's federal claims.") (citing *Williams v. Horvath*, 548 P.2d 1125, 1130 (Cal. 1976) ("[W]hile it may be constitutionally permissible for the Legislature to place [a] substantive impediment in the path of a state cause of action, it is clear that the [S]upremacy [C]lause will not permit a like abrogation of the prerequisites of a federal civil rights litigant.")); *Felder v. Casey*, 487 U.S. 131, 153 (1988) ("A state law that conditions that right of recovery upon compliance with a rule designed to minimize governmental liability, and that directs injured persons to seek redress in the first instance from the very targets of the federal legislation, is inconsistent in both purpose and effect with the remedial objectives of the federal civil rights law. Principles of federalism, as well as the Supremacy Clause, dictate that such a state law must give way to vindication of the federal right when that right is asserted in state court.").

# FACTUAL ALLEGATIONS

19. On November 30, 1992, an information was filed charging Mr. Boyette and codefendant Antoine Johnson with two counts of murder by use of a firearm of Gary Carter and Annette Davallier, which occurred on May 23, 1992. As to both defendants, two special circumstances, lying in wait and multiple murder, were alleged. The information included the allegations of personal use of firearm and further charged defendants with being felons in possession of a firearm.

20. Co-Defendant Johnson's trial was severed from Plaintiff's, and Plaintiff was tried first. On March 11, 1993, the jury found Mr. Boyette guilty of two counts of first-degree murder, including the special circumstance of multiple murder, and the arming allegations. He was acquitted of the lying in wait special circumstance.

21. Following a penalty trial, Mr. Boyette was sentenced to death on March 25, 1993.

## I. Prosecutor Terese Drabec Engaged In Racial Discrimination In Jury Selection, In Violation Of *People v. Wheeler* And *Batson v. Kentucky*

22. At Plaintiff's capital trial, Deputy District Attorney ("DDA") Terese Drabec engaged in discriminatory jury selection, exercising peremptory strikes against four of the first six Black women who were called. Consistent with the custom and/or practice of identifying Black jurors who could be kept to deflect scrutiny, DDA Drabec did not strike two Black women jurors, and a third was seated after she had run out of peremptory strikes.

23. After DDA Drabec struck jurors Alston, Davis, Wiggins, and Farwell, trial counsel raised a *Wheeler* motion on the ground that the prosecutor demonstrated a systematic exclusion of Black potential jurors by excluding four Black women.

24. The trial court at first stated it did not think a prima facie case of discrimination had been made, but invited DDA Drabec to justify her peremptory

strikes. She indicated that she believed these jurors would not sentence Mr. Boyette to death despite their statements that they could.

25. After hearing the prosecutor's explanations, the court denied the motion, reiterating that no prima facie case had been shown. The court also took pains to reinforce the prosecutor "on her challenges of the four black African American women," saying it "did not believe they were persons who would vote for the penalty of death based upon their questionnaires and their answers."

26. In denying Mr. Boyette's motion, the trial court failed to appropriately apply the *Batson/Wheeler* framework, holding Plaintiff to a higher prima facie burden and finding the proffered race-neutral reasons reasonable despite no record support for the belief that the four struck jurors would not be able to impose the death penalty.

27. Prospective Juror Barbara Wiggins, on her questionnaire, stated she was "moderately in favor" of the death penalty, would vote for a proposition to have a death penalty in California if it were on the ballot, and indicated that she could vote to impose the death penalty depending on the circumstances. On voir dire, Ms. Wiggins reiterated that she was moderately in favor of the death penalty, that depending on the circumstances she was capable of returning a death verdict, and said she would "have an honest choice" between the two penalties. Although she answered one question on the juror questionnaire that she could not vote for death if life without the possibility of parole was an option, on voir dire, this was clarified, as she made clear that she could vote for either penalty.

28. Prospective Juror Valette Farwell indicated she was "neutral" in her attitude towards the death penalty, she would vote to retain the death penalty if presented with a proposition, she could vote to impose the death penalty depending on the circumstances, and "agree[d] somewhat" with the proposition that "anyone who intentionally kills another person should always get the death penalty." During voir dire, Ms. Farwell reiterated her neutrality on the question of capital punishment,

and that she could vote for death based on the circumstances of the case outlined by the court. She agreed there was nothing in the allegation of the murder of two persons which would prevent her from returning a death verdict, depending upon the evidence. Ms. Farwell even indicated that she believed life imprisonment was a worse punishment than death, but agreed to follow the law with regard to death being the worse of the two punishments. Ms. Farwell indicated she could choose either death or life without the possibility of parole, depending on the evidence, and would "have an honest choice" between the two penalties.

29. Prospective Juror Linda Davis, on her questionnaire, stated she was "moderately in favor" of the death penalty, would vote for a proposition to have a death penalty in California if it were on the ballot, that she could vote to impose the death penalty depending on the circumstances, and "agree[d] somewhat" with the proposition that "anyone who intentionally kills another person should always get the death penalty." On voir dire, Ms. Davis reiterated that she was moderately in favor of the death penalty, and that depending on the circumstances, she was capable of returning a death verdict and would "have an honest choice" between the two penalties. Like Ms. Farwell, Ms. Davis believed that life imprisonment was a worse punishment than death but agreed to follow the law.

30. In contrast, several seated jurors were much more equivocal than Ms. Wiggins, Ms. Farwell, and Ms. Davis, who were struck.

31. Seated Juror Christine Rennie indicated on her questionnaire and on voir dire that she was "moderately against" the death penalty, that it would be difficult to vote to impose the death penalty, and that she was unsure whether she could do so. She ultimately agreed that she could probably vote to impose death.

32. Seated Juror Marland Orgain indicated on her questionnaire and on voir dire that she was "moderately in favor" of the death penalty. She also stated that she believed that life in prison without the possibility of parole was a worse punishment than death, but would follow the law that death is the more severe of

the two punishments. Although Ms. Orgain indicated in her questionnaire that she would not be able to vote for either penalty, she stated on voir dire that she, in fact, could choose either penalty.

33. Seated Juror Carmen Garcia indicated in her questionnaire and on voir dire that she was "moderately in favor" of the death penalty and she could make an honest choice between the two penalties.

34. Seated Juror Darlene Perez indicated on her questionnaire and on voir dire that she was "neutral" on the death penalty. She also stated in her questionnaire that she believed that life without the possibility of parole was a worse punishment than death before being informed that the law was to the contrary.

35. There is no meaningful way to distinguish the answers regarding attitudes toward imposing the death penalty expressed by seated jurors, versus those from prospective Black jurors who were struck. Several of the seated jurors expressed similar if not identical views. Yet, while the Black jurors were excused, each of the above individuals went unchallenged and sat on the jury. A review of the prosecutor's justification for excusing the Black women, compared to the statements provided by those jurors who ultimately sat in this case, reveals nothing more than sham excuses belatedly contrived to avoid admitting the group discrimination.

36. The prosecutor's jury selection notes further evidence purposeful discrimination. Although most of the jury selection notes from Mr. Boyette's case have been lost or destroyed, the forty-one pages of notes disclosed paint a clear picture of the targeting of Black prospective jurors. Black prospective jurors were repeatedly flagged throughout the notes, including by marking those jurors as either "MB" or "FB." With very limited exception, the race of other jurors was not tracked.

37. Further, the notes indicate that Ms. Wiggins was initially rated by the prosecutor as an "okay" juror with a numerical ranking of 7 on a scale of 1-10. That

number was then crossed out and replaced with a 0. Similarly, Ms. Farwell was initially rated as "good" with a score of 7+ that was then crossed out. In contrast, seated juror Darlene Perez, who gave similar questionnaire and voir dire answers to the struck jurors, was rated as a 5 by the prosecutor. Despite receiving a lower rating than Ms. Wiggins and Ms. Farwell, Ms. Perez was not struck.

38. The ACDAO has conceded that the prosecutor's tracking of Black jurors and the indistinguishability between the struck and seated jurors, indicates that in all likelihood Plaintiff was denied a fair trial.

## II. The Constitutional Violations Resulted From The ACDAO'S Administrative Policy, Custom, And Or Practice Of Eliminating Black And Jewish Jurors Based On Race And/Or Ethnicity, And Failure To Take Corrective Action When It Happened

39. Death sentences in California require, *inter alia*, the defendant to be charged—at the sole and unfettered discretion of the District Attorney—with at least one special circumstance.

40. For the special circumstance allegation to be found true, the District Attorney is required to prove an enhanced burden of proof. Absent a jury finding the special circumstance(s) to be true, a defendant neither can be sentenced to death, nor to life in prison without the possibility of parole.

41. Death sentences are politically fortuitous. They bolster the "tough on crime" bona fides for District Attorney's facing re-election, and capital convictions are good résumé builders for rank-and-file deputy district attorneys who have ambitions to be appointed to the bench. Seeking to promote their own careers, policymakers at the ACDAO developed an administrative policy, custom, and/or practice related to jury selection. That administrative policy, custom, and/or practice was not case specific; it applied to all capital cases.

42. Determined to ensure the imposition of death sentences, and victory in those cases, the ACDAO set out to rig juries. ACDAO prosecutors determined

that Black and Jewish jurors were unfavorable to them and set out to eliminate members of those two race/ethnicities from juries. Thus, the ACDAO routinely and as a matter of office-wide practice, used peremptory strikes to eliminate Black and Jewish jurors from service based on their race and/or ethnicity.

43. For decades, the ACDAO had an unwritten administrative policy, custom, and/or widespread practice within its office—and particularly its capital unit—of racial discrimination in jury selection. Specifically, and as relevant here, Alameda prosecutors devised to strike Jewish and Black people from capital juries due to a belief that they would not return a death verdict. The error deprived Plaintiff of a jury of his peers and a fair trial. The ACDAO's administrative policy, custom, and/or practice was promoted verbally in order to evade scrutiny. ACDAO policymakers intentionally failed to adequately train and/or supervise employees in order to carry out the administrative policy, custom, and/or practice that amounted to deliberate indifference towards Plaintiff's constitutional rights and failed to take corrective action when they knew prosecutors were violating Plaintiff's constitutional rights.

44. The ACDAO is headed by a District Attorney who is designated as the final policymaker for the ACDAO. The District Attorneys throughout the relevant time periods discussed herein include: John H. Meehan (1981–1994), Thomas J. Orloff (1994–2009), Nancy O'Malley (2009–2023), Pamela Price (2023–2024), and Ursula Jones Dixon (2025–2026).

45. Other policymakers in the ACDAO included:

a. James Anderson, who was an Alameda County Deputy District Attorney from 1971 to 2004. After the death penalty returned to Alameda County in the late 1970's, DDA Anderson tried the first capital case of the new era. The trial of David and Kenneth Moore involved 58 counts, including two counts of first-degree murder, each with two special circumstances. The

administrative policies, customs, and/or practices alleged herein were developed at least as early as the prosecution of the Moores. From the time of the Moores' trial to his retirement in 2004, DDA Anderson was the delegated policymaker for the capital cases—first by District Attorney John Meehan, and then by his replacement, District Attorney Tom Orloff. They delegated both administrative and prosecutorial policymaking decisions pertaining to the capital cases to DDA Anderson. Removing any doubt that DDA Anderson was such, in 1991 DA Meehan appointed DDA Anderson as the head of the capital unit, a position he held until his retirement in 2004. As such, DDA Anderson continued to personally set, establish, oversee, and manage the policies, customs, and/or practices of the ACDAO capital prosecutions and prosecutors for Defendant County of Alameda, including the unconstitutional practices involving the exclusion of Black and Jewish jurors from capital cases, in violation of Plaintiff's constitutional rights. DDA Anderson has made clear that he viewed the removal of certain races and ethnicities as a blanket measure rather than a prosecutorial strategy in any particular case, stating that eliminating Jewish and Black jurors was "not a racist thing, but just common sense."

b. John R. ("Jack") Quatman, who was an Alameda County Deputy District Attorney from 1973 to 1998. In 2003, he was ostracized by his former colleagues for being a whistleblower, when he publicly revealed the ACDAO's unconstitutional jury selection practices.

c. Kenneth Burr, who was an Alameda County Deputy District Attorney and second in command of the capital unit in the 1990s under James Anderson. He later sat as a judge on the Alameda County Superior Court for two decades.

d. Morris Jacobson, who was an Alameda County Deputy District Attorney from 1989 to 2005, and then a judge on the Alameda County Superior Court for two decades. DDA Jacobson assisted DDA Colton Carmine with jury selection during Ernest Dykes' capital trial, including the unconstitutional targeting of Black and Jewish prospective jurors. DDA Jacobson also was in charge of the investigation into the allegations raised by whistleblower Jack Quatman, instructing others in the ACDAO "to find dirt on Quatman."

46. Other Alameda County Deputy District Attorneys who handled special circumstances homicide cases, and therefore employed the ACDAO's unconstitutional administrative policies, customs, and/or practices included, *inter alia*, Colton Carmine, Ted Landswick, Jon Goodfellow, Albert Meloling, Terese Drabec, and Angela Backers.

47. The ACDAO and its policymakers failed to adequately train, oversee, correct, supervise, and/or discipline its employees whose discriminatory method of jury selection was widely known and practiced within the office in deliberate indifference towards Plaintiff's constitutional rights.

48. Plaintiff is informed and believes that:

a. The ACDAO did not have a written rule of excluding Black and Jewish people from juries, but the rule was known within the office, and everyone was expected to follow it.

b. It was the ACDAO's standard practice to exclude Jewish and Black potential jurors from capital juries.

c. The office had a policy of not having policies. It was the office culture not to have a written policy for fear of repercussion, because they knew what they were doing was wrong.

d. Senior prosecutors like DDAs Anderson and Quatman educated less experienced lawyers on this unwritten policy, custom, and/or practice. This "training" was often conducted where people went for camaraderie and knowledge: the office library and a bar called "The Fat Lady." These were places where oral tradition and office lore were passed along. It was there that junior attorneys learned what they were expected to know, like how to get rid of Black and Jewish jurors. The library and The Fat Lady were considered safe spaces where the prosecutors could say anything. If someone took issue with what was being said, the expectation was that they should get up and leave.

e. Many senior attorneys would not talk to younger attorneys unless they engaged in this culture.

f. DDA Quatman expanded beyond the ACDAO's administrative policy, formally training prosecutors in this custom during a large prosecution conference attended by a few hundred people that took place in San Diego, California from June 17–19, 1992. On the first day of the conference, which focused on special circumstances cases, DDA Quatman did a training presentation with Martin Murray, the chief DDA in San Mateo County. During that conference DDA Quatman told those present to strike Jewish jurors from capital cases. Some members in the audience expressed shock and objected, but DDA Anderson, who was present, spoke out in defense of

DDA Quatman. Kenneth Burr, second in command of the capital unit, was also present at the training, as was Colton Carmine, whose notes targeting Jewish jurors led to DA Price's admission regarding her office's history of racial discrimination. After the training, back at the office, DDA Anderson repeatedly told the story of what DDA Quatman had said. Neither DDA Anderson nor any other ACDAO policymaker condemned it, and DDA Quatman was never disciplined in any way by DA Meehan or anyone else. DDA Quatman further shared jury selection advice with many other deputies within the ACDAO, both privately and in the law library where the prosecutors gathered daily to discuss cases and office matters.

49. As head of the capital unit, DDA Anderson was responsible for overseeing and disciplining each of the prosecutors handling special circumstance cases, including ensuring they were properly trained in their constitutional obligations. The capital unit prosecuted special circumstance homicide cases, but Plaintiff is informed and believes formal training as to the nature and scope of their *Batson* obligations was eschewed in favor of informal passing of the lore. The goal was to not create a trail evidencing the unconstitutional conduct. Like most DA's offices, the ACDAO was a brotherhood where prosecutors were never supposed to "break rank" and complain about a lack of ethics or clear violations of law. The ACDAO avoided accountability by not putting unethical instructions in writing. The ACDAO passed along its administrative policies, customs, and/or practices through oral tradition, so they could deny any wrongdoing if subjected to scrutiny.

Instead of putting things in writing, as the Dallas DA infamously did,[2] the ACDAO used discussions within their offices, the library, or at The Fat Lady bar, to educate prosecutors on pretexts to overcome *Batson* objections, in furtherance of the unconstitutional administrative policy, custom, and/or practice.

50. Supervising DDA Anderson, who believed that violating *Batson* was simply "common sense," told attorneys what to do. DDA Anderson routinely applied this "common sense" discriminatory policy, custom, and/or practice in the cases he prosecuted, targeting Black and Jewish people for removal from capital juries. As detailed later herein, five of his cases (Ervin, Hill, Lopez, Lynch, and Thomas) have since been overturned, and/or the defendants resentenced, based on acknowledged constitutional violations.

51. The ACDAO and its attorneys went to great lengths to either be ignorant of its obligations or to feign ignorance, but John Meehan, Tom Orloff, Bob Platt, Jim Anderson, and the other senior deputies at the superior courthouse were well aware of the unwritten jury selection policies, customs, and/or practices. None of them disciplined prosecutors who were unconstitutionally striking jurors, nor did they object to the discussions about how to get away with the unconstitutional practice of striking jurors based on race and/or ethnicity. The practice was so encouraged, and discipline for such unconstitutional strategies so absent, that they

[2] "[T]he [Dallas] District Attorney's Office had adopted a formal policy to exclude minorities from jury service. A 1963 circular by the District Attorney's Office instructed its prosecutors to exercise peremptory strikes against minorities: 'Do not take Jews, Negroes, Dagos, Mexicans or a member of any minority race on a jury, no matter how rich or how well educated.' App. 710. A manual entitled 'Jury Selection in a Criminal Case' was distributed to prosecutors. It contained an article authored by a former prosecutor (and later a judge) under the direction of his superiors in the District Attorney's Office, outlining the reasoning for excluding minorities from jury service. Although the manual was written in 1968, it remained in circulation until 1976, if not later." *Miller-El v. Cockrell*, 537 U.S. 322, 334–35 (2003) (cleaned up).

did not even object to DDA Quatman's teaching them to deputies statewide at the 1992 San Diego conference.

52. As a result, at best, the ACDAO's compliance with its constitutional obligations was arbitrary, incomplete, and in deliberate indifference to a defendant's right to due process.

53. The ACDAO and its policymakers had actual or constructive notice that the lack of proper training on jury selection, and lack of disciplinary proceedings for discriminating against jurors, would cause its employees to violate citizens' constitutional rights, and were deliberately indifferent to the harm.

54. The ACDAO's unconstitutional policy, custom, and/or practice began at least as early as the first post-*Furman* capital trial in Alameda County, that of David and Kenneth Moore in 1980. Tried by DDA Anderson, the targeting of Black and Jewish potential jurors therein continued at least through the 2012 trial of David Mills, tried by Jim Meehan, the son of John Meehan, the ACDAO District Attorney from 1981 to 1994. The discrimination against Black and Jewish jurors that began at least as early as the Moores' trial became systemic during DA John Meehan's time helming the office, as the practice expanded to an administrative policy, custom, and/or practice carried out by DDA Anderson, who was delegated the authority to oversee capital cases. It was precisely because his malfeasance yielded results, that DDA Anderson was rewarded by being publicly named as the head of the capital unit (AKA the "death team") in 1991, a position he held until his retirement in 2004.

55. The ACDAO's history of discriminatory and unconstitutional conduct, particularly in capital cases involving special circumstance prosecutions, is clear from a review of its cases. In chronological order, below are a sampling of cases in which Alameda prosecutors engaged in racial discrimination in jury selection:

56. *People v. Mitcham*, Alameda No. 76826A – In the 1984 capital trial of Stephan Louis Mitcham, prosecutor Albert Meloling struck eight out of eight Black prospective jurors that made it to the jury box. DDA Meloling's notes show that he rated each juror as either "K" (indicating a positive rating) or "O" (indicating a negative rating). Each Black juror was identified with the letter "B" next to their name and given an "O" rating. One juror was noted as "[k]eep if necessary to avoid *Wheeler,*" further indicating that DDA Meloling knew his actions were improper and wanted to cover them up, just as was done in Mr. Dykes' trial with a juror identified as "*Wheeler* fodder." The conviction was overturned by a federal district court based upon this misconduct.

57. *People v. Hill*, Alameda No. 84675 – DDA James Anderson prosecuted the 1987–88 capital trial of Michael Hill. As with the other cases prosecuted by DDA Anderson (Ervin, Lynch, Lopez, and Thomas), there was concern over the propriety of his conduct in jury selection. Ultimately, the ACDAO opted to resolve the matter by recommending resentencing after a court issued an order to show cause on Mr. Hill's claim that DDA Anderson engaged in prosecutorial misconduct pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Napue v. Illinois*, 360 U.S. 264 (1959).

58. *People v. Schmeck*, Alameda No. H9033 – In the 1989 capital trial of Mark Schmeck, prosecutor Ted Landswick struck two out of three Jewish jurors and said on the record that he would strike the third if she made it into the jury box. In justifying the strikes, DDA Landswick misrepresented the record in several respects, including by feigning ignorance that the jurors were Jewish, despite having questioned them on that subject. The ACDAO conceded misconduct, the conviction was vacated, and judgment was imposed on a lesser-related offense before Mr. Schmeck was then resentenced to a reduced term of imprisonment based on voluntary manslaughter.

59. *People v. Ervin*, Alameda No. 87023A – In the 1990–91 capital trial of Curtis Lee Ervin, DDA Anderson exercised 15 peremptory strikes, removing 9 of the 11 Black prospective jurors subject to questioning. Three Black males and six Black females were struck, leaving one Black man on the petit jury and one as an alternate. By keeping at least one Black man for the sake of appearances, DDA Anderson acted consistently with the office's unwritten administrative policy, custom, and/or practice to cover up the misconduct. The Ninth Circuit reversed and remanded on Plaintiff's *Batson* claim, finding that DDA Anderson made misrepresentations of the record in his efforts to justify the strikes. Jury selection notes show that Anderson was exclusively tracking Black jurors and described several as untrustworthy, too cocky, or arrogant. The record suggests that he also targeted Jewish prospective jurors. The conviction was vacated after the Attorney General conceded the misconduct as to the Black jurors.

60. *People v. Lynch*, Alameda No. H010662 – In the 1991–92 trial of Frank Lynch, DDA Anderson used peremptory strikes against three Black women. Jury selection notes indicate that DDA Anderson tracked only the Black jurors, identifying them in some places with a "B" next to their name and in others with a red dot—which he consistently did across his cases. DDA Anderson also ranked these jurors lower than non-Black jurors, with no support in the record for the lower rankings. The conviction was vacated after an Order to Show Cause issued on Mr. Lynch's *Batson* and Racial Justice Act claims, and the ACDAO conceded error on the latter. Mr. Lynch is pending retrial.

61. *People v. Tully*, Alameda No. H9798 – In the 1992 capital trial of Richard Christopher Tully, prosecutor Kenneth Burr used peremptory strikes against four people of color, including three Black jurors, and a juror he believed to be Jewish. With respect to at least one of the Black jurors stricken, prosecutor notes indicate that DDA Burr mischaracterized the juror's responses to create pretextual reasons for the strike. Mr. Tully was resentenced after the ACDAO recommended

resentencing based in part on concern over the constitutional implications of those strikes.

62. *People v. Boyette*, Alameda No. 114009B – In Plaintiff's 1993 capital trial, prosecutor Terese Drabec struck four Black women from the jury. DDA Drabec provided pretextual reasons for the strikes that conflicted with the record. Jury selection notes indicate that DDA Drabec was tracking only Black jurors and flagged Black jurors multiple times. Consistent with the custom and/or practice of identifying Black jurors who could be kept to deflect scrutiny, DDA Drabec did not strike two Black jurors, and a third was seated after she had run out of peremptory strikes. The ACDAO conceded misconduct, Plaintiff's conviction was vacated, and judgment was imposed on a lesser-related offense before Mr. Boyette was then resentenced to a reduced term of imprisonment based on voluntary manslaughter.

63. *People v. Pollock*, Alameda No. H13546 – In the 1994 capital trial of Milton Pollock, DDA Carmine used peremptory strikes to exclude four Black women from the jury. Two of the excluded jurors provided answers that were prosecution-friendly and similar to answers given by non-Black jurors that were not excluded. The ACDAO recommended resentencing for Mr. Pollock based in part on concern over the constitutional implications of those strikes.

64. *People v. Dykes*, Alameda No. 118376 – In Ernest Dykes' 1995 capital trial, DDA Carmine struck the only Black juror that made it to the jury box. Notes from the case indicate that DDA Carmine intended to strike all Black and Jewish jurors, in accordance with the ACDAO's administrative policy, custom, and/or practice. Among the notes was the now infamous, "I liked him better than any other Jew But No Way." The ACDAO conceded misconduct, the conviction was vacated, and judgment was imposed on a lesser-related offense before Mr. Dykes was then resentenced to a reduced term of imprisonment based on voluntary manslaughter.

65. *People v. Thomas*, Alameda No. 118686B – DDA James Anderson prosecuted the 1997 capital trial of Keith Tyson Thomas. Due in part to DDA Anderson's documented racial discrimination in jury selection (*see* Ervin, Lynch, and Lopez), and because no jury selection notes were found pertaining to Mr. Thomas' case, in 2024 the ACDAO recommended resentencing out of concern for the constitutional implications presented.

66. *People v. Love*, Alameda No. C124801 – In the 1999 trial of Terrell Love, DDA Carmine, who also prosecuted Messrs. Dykes and Pollock, struck five Black women from the jury. When a *Batson* challenge was raised, DDA Carmine defended his strikes by pointing to a Black woman who had not yet entered the jury box as one that he would have accepted. He also claimed he would have kept a Black man struck by the defense. This is reminiscent of the *Wheeler* pretext notes found in Mr. Dykes' case. Echoing DDA Anderson, DDA Carmine expressed concern about one juror's religiosity. Another Black woman was excused because she was married to a college professor, who, in turn, was "the type of person [the prosecutor found] extremely reluctant to ever impose the death penalty." The federal court found many of these, and other reasons given by DDA Carmine to be pretextual and reversed Mr. Love's conviction. *See Love v. Yates*, 586 F. Supp. 2d 1155 (N.D. Cal. 2008).

67. *People v. Seumanu*, Alameda No. H24057 – In the 2000 capital trial of Ropati Seumanu, prosecutor Angela Backers used peremptory strikes to exclude four Black women from the jury, and the record suggests she likely would have struck a fifth Black juror if she had made it to the jury box. Disclosed prosecutor notes show that DDA Backers placed black asterisks next to the names of five Black jurors, including three of the jurors she ultimately struck. No non-Black jurors were marked with asterisks. The record indicates that some of the struck jurors provided neutral or prosecution-friendly voir dire and questionnaire answers and provided no discernable race-neutral reasons for the strikes. Mr. Seumanu was resentenced after

the ACDAO recommended resentencing based in part on concern over the constitutional implications of those strikes.

68. *People v. Lopez*, Alameda No. H28492A – In the 2000–01 capital trial of Miguel Augustine Lopez, prosecutor James Anderson used seven of fourteen peremptory challenges to remove all people of color from Mr. Lopez's jury, resulting in a trial by an all-white jury. Given other evidence of DDA Anderson's discriminatory conduct in jury selection, the ACDAO recommended resentencing of Mr. Lopez based in part on concern over the constitutional implications of those strikes.

69. Although the following cases have not been overturned to date, the ACDAO employed its unconstitutional practices in many other cases, a sampling of which are below:

70. *People v. Friend*, Alameda No. 81254 – In the capital trial of Jack Friend that spanned 1988 to 1992, including a mistrial/retrial on special circumstances and penalty, DDA Ted Landswick (whom the State conceded committed jury selection error in the prosecution of Mr. Schmeck) used peremptory challenges to exclude four Black jurors from Mr. Friend's first trial, one Black juror from his second trial, and the only two Jewish jurors from his second trial. Jury selection notes indicate that DDA Landswick was marking Black jurors with a "B" next to their names and was not identifying other jurors by race. One of the Black jurors struck by DDA Landswick had stated, "[w]ell, if somebody takes somebody's life, I just think they need to die." In contrast, a seated white juror said the death penalty was a "last resort." DDA Landswick also rated one of the Jewish jurors his lowest possible rating, with no indication in the record to support such a rating, and despite giving a seated juror who had indicated qualified support for the death penalty a high rating. In 2024, the ACDAO "concede[d] that [DDA Landswick's] actions during jury selection at both trials raise[d] substantial concerns that ethnicity was a factor in the use of peremptory strikes." *See People v. Friend*, People's

Motion Requesting 1172.1 Recall of Sentence & Resentencing Hearing Pursuant to 1172.1, at 13; *see also id.* at 20 ("Further complicating this case is what appear [*sic*] to be strong, if not decisive *Batson/Wheeler* issues at both trials.").

71. *People v. Stevens*, Alameda No. 102962A – In the 1992–93 trial of Charles Stevens, DDA Burr used peremptory strikes to exclude seven of eight Black jurors on the petit jury and six of six Jewish jurors. In early 2025, the Attorney General's office disclosed jury selection notes unequivocally establishing that DDA Burr was targeting Jewish jurors. In these notes, DDA Burr tagged several jurors with "Q Rule," i.e. the "Quatman Rule" promoted by DDA Quatman, that Jewish jurors should be removed from capital juries. Mr. Stevens was tried only a few months after DDA Quatman advocated this rule to prosecutors statewide during the now-infamous San Diego training seminar. The *Batson* error in Mr. Stevens' case was recognized by the federal district court judge overseeing the habeas, who denied relief only because of the procedural bars erected by 28 U.S.C. § 2254.

72. *People v. Nadey*, Alameda No. 129807 – In the 1998–99 capital trial of Giles Albert Nadey, DDA Anderson (who engaged in discriminatory jury selection in the prosecutions of Messrs. Ervin, Hill, Lopez, Lynch, and Thomas) used peremptory strikes to exclude five Black women from the jury, and no Black jurors were seated. DDA Anderson provided pretextual reasons for the challenges that are not supported by the record, seating non-Black jurors who provided similar responses to those DDA Anderson allegedly found troublesome.

73. *People v. Lewis*, Alameda No. 128675 – In the 1999–2000 capital trial of Keith Allen Lewis, as she did in *Seumanu*, DDA Backers targeted Black women for removal, striking eight Black women from Mr. Lewis' jury. In an effort to evade scrutiny, she left a bi-racial female and two Black men on the jury. DDA Backers' juror notes were missing from Mr. Lewis' criminal case file. Mr. Lewis' automatic appeal, alleging *Batson* and other errors, is pending before the California Supreme Court.

74. *People v. Sifuentes,* Alameda No. H27160B – In the 2003 capital trial of Miguel Galindo Sifuentes, prosecutor Jon Goodfellow struck nine out of twelve Black jurors. A federal district court found *Batson* error, but the decision was overturned on appeal due to the extremely restrictive standard of 28 U.S.C. § 2254.

75. *People v. Freeman*, Alameda No. 79502A – ACDAO and Defendant County's deliberate indifference to the constitutional rights of capital defendants was first publicly disclosed in 2003, in post-conviction proceedings relating to the 1987 capital prosecution of Fred Freeman. In postconviction litigation, DDA Quatman, who prosecuted Freeman, provided sworn testimony that the ACDAO maintained a standard practice of systematically excluding Black and Jewish jurors—a practice DDA Quatman alleged was encouraged by senior office leadership. Instead of acknowledging or investigating the claims, the ACDAO successfully conspired to discredit DDA Quatman personally.

76. The disclosure of DDA Carmine's notes in the *Dykes* case confirmed what DDA Quatman said was true, despite DDA Carmine having arguably been the most ruinous witness to falsely discredit DDA Quatman.

77. The 62,000 pages of notes disclosed thereafter, from decades of prosecutions, confirmed DDA Quatman's testimony at the *Freeman* hearing, and the ACDAO's unconstitutional custom and/or practice.

78. Following DDA Quatman's revelation, rather than utilizing the opportunity to implement corrective training or transparent audit protocols, the ACDAO's leadership maintained a defensive posture of non-disclosure to maintain the coverup. This failure to act upon decades of notice was a moving force behind the full extent of the constitutional injury to Plaintiff.

79. That these notes were in the possession, custody, and control of the ACDAO and Defendant County for decades before any action was taken to acknowledge or correct the constitutional error shows that the ACDAO and Defendant County were deliberately indifferent to their constitutional obligations.

80. These violations were directly, foreseeably, proximately, and/or substantially caused by the unlawful administrative policies, customs, and/or practices of the ACDAO, as well as by the deliberate indifference of policymakers at that office, acting on behalf of the Defendant County, to the occurrence of such constitutional violations.

81. As a result of the administrative policies, customs, and/or practices and through the absence of training, oversight, corrective measures, and/or proper management by the ACDAO and its senior employees, the Deputy District Attorneys responsible for capital homicide prosecutions believed it was expected that they intentionally eliminate Black and Jewish jurors based on their race and ethnicity.

**III. Mr. Boyette's Conviction Has Been Invalidated**

82. On August 28, 2024, the ACDAO moved to have Mr. Boyette's sentence recalled and that he be resentenced in the interest of justice. The motion was made as a direct result of the prosecutorial misconduct conceded in Mr. Boyette's case.

83. On September 17, 2024, the Alameda County Superior Court recalled Mr. Boyette's sentence, and he was resentenced to a determinate term of 35 years, consisting of the following:

a. Voluntary Manslaughter (Cal. Pen. Code § 192), receiving a term of eleven years;

b. Voluntary Manslaughter (Cal. Pen. Code §192), receiving a term of eleven years;

c. Felon in Possession of a Firearm (Cal. Pen. Code §12021), receiving a term of two years; and

d. Three enhancements for use arming (Cal. Pen. Code § 12022(a)) and use of a firearm (Cal. Pen. Code § 12022.5), receiving eleven total years.

84. In 1992, when these crimes occurred, Mr. Boyette was entitled to a fifty percent credit on time earned for good behavior; therefore, he was entitled to release after seventeen and a half years.

85. Mr. Boyette was arrested on July 30, 1992. On May 22, 2025, Mr. Boyette was released from custody after 32 years, 9 months, and 22 days of incarceration.

86. But for the Defendant County's unconstitutional conduct, even if convicted of the charges in ¶83, Mr. Boyette would have been released from prison on or about January 30, 2010, and would never have been on death row. That means he would not have been subjected to the solitary confinement of death row, the particularly egregious and unsanitary conditions of death row, the constant psychological torture of having a death sentence hanging over his head, and the emotional distress of death row.

87. Because of the unconstitutional conduct of the Defendant County, Mr. Boyette was incarcerated for at least 15 years, 3 months, and 22 days longer than he should have been.

## **DAMAGES**

88. Plaintiff was convicted of special circumstance murder and sentenced to death in 1993.

89. At the time of Plaintiff's arrest in 1992, he was 19 years old; he was 52 years old upon release in 2025.

90. Plaintiff suffered years of unlawful incarceration, depriving him of his freedom and adequate access to family and loved ones, confined daily to a small cell that weighed on his mental and physical health for at least 20 hours each day, and denied adequate healthcare and nutrition.

91. From 1993–2024, following his conviction and death sentence, Plaintiff was incarcerated at San Quentin State Prison.

92. As a condemned prisoner, Mr. Boyette was denied regular housing, liberties, privileges, and programming that the non-capital 25,000+ California prisoners convicted of homicide received. Mr. Boyette was housed exclusively with hundreds of condemned prisoners for 31 years. He was surrounded by those who were, as a matter of law, deemed to be unworthy of life, and separated from other California prisoners.

93. As a condemned prisoner, Mr. Boyette was denied programming, parole eligibility, and credits toward release. As a result, he was never on track to be reviewed for, qualified for, or released on parole, as are all non-special circumstance prisoners.

94. Plaintiff was housed with other condemned men, awaiting execution. He was forced to live with unremitting, cacophonous noise as a result of the close and packed housing conditions and the screaming, banging, and other disturbed noises that many of the mentally ill men with whom he was housed make. For all of his confinement, Plaintiff endured unconstitutionally cruel and deplorable conditions.

95. In February 2008, a federal district court judge found that numerous conditions at San Quentin State Prison violated the United States Constitution, including the presence of rodents and vermin on the tiers, flooding from the showers, lack of cleaning supplies, and excessive noise. *See* Findings of Fact and Conclusions of Law after Bench Trial on Motion to Terminate Consent Decree, *Lancaster v. Tilton*, Case No. C 79-01630 (N.D. Cal. Feb. 15, 2008).

96. Food quality and quantity was substandard, depriving Plaintiff of adequate sustenance and nutrition; prisoners were routinely served food that was spoiled, such as expired milk, wilted vegetables, dry bread, and sour rotten meat. The quantity and nutritional quality of food provided by the prison was insufficient to maintain Plaintiff's health.

97. A death sentence, such as Plaintiff's, which does not serve legitimate and substantial penological goals that can otherwise be accomplished by an alternative sentence violates the Eighth Amendment. A punishment is deemed excessive and unconstitutional if it serves no penal purpose more effectively than would a less severe punishment. Here, the ACDAO has effectively admitted that a less severe punishment was warranted by offering Plaintiff such and aiding in the imposition of it.

98. As a condemned prisoner, Mr. Boyette suffered over three decades of never-ending severe psychological trauma from the threat of execution. He was delivered to San Quentin's death row on May 7, 1993, shortly after the State of California resumed executions. Mr. Boyette was incarcerated on death row during all but one of the thirteen executions California carried out after the resumption of the death penalty.

99. Between August 1993 and January 2006, Mr. Boyette endured the psychological trauma of twelve executions. Three other men who were not executed came within hours of execution only to have those executions stayed.

100. During this same time, several of the executions were botched or unnecessarily torturous. Significant publicity focused on the torturous nature of the method of execution employed in California, thus adding to Plaintiff's emotional distress.

101. Between May 1993 and January 2006, Plaintiff endured the psychological trauma of those executions. For thirteen years, every time a neighbor was led away to the execution chamber, Plaintiff was forced to confront his own state-sanctioned execution. Even after California conducted its last execution in 2006, the psychological trauma continued, as executions were merely on hold, not banned. As a condemned prisoner, Plaintiff suffered three decades of never-ending severe psychological trauma from the threat of execution. For a man of his age and education, this was particularly difficult to endure.

102. Plaintiff also had to endure the psychological and emotional torture of being on death row in the summer of 2020, when COVID-19 ran rampant through San Quentin State Prison. By July 17, 2020, there were 2,063 confirmed prisoner tests and 226 confirmed staff cases at San Quentin. U.S. District Court Judge Jon S. Tigar noted that the "number of inmate infections is undoubtedly even higher because hundreds of inmates have refused to be tested." *See Plata v. Newsom*, CAND Case No. 4:01-cv-01351-JST, Dkt. No. 3373, filed July 5, 2020. Even without the additional confirmed cases, the New York Times identified San Quentin State Prison as the second greatest coronavirus cluster in the United States as of July 23, 2020. A dozen death row prisoners died from COVID-19. This was nearly eleven years after Plaintiff should have been released. Instead, because of the unconstitutional conduct, he was prevented from choosing where to quarantine and with whom he wanted to quarantine. Plaintiff was one of the prisoners who contracted COVID in July of 2020.

103. While housed at San Quentin, Plaintiff suffered under an antiquated healthcare system, oftentimes having to endure many months or more of pain while waiting for essential treatment.

104. As a condemned prisoner, all legal visits or visits by family or friends were conducted in a room with a shared wall to the California Department of Corrections and Rehabilitation ("CDCR") execution chamber.

105. As a condemned prisoner, Plaintiff's liberty was deprived, controlled, and handled by, among others, executioners from the CDCR's execution team.

106. This psychological burden was the direct and foreseeable result of a conviction the ACDAO and Defendant County knew was engineered by racism and structurally unsound.

107. Following the closure of death row at San Quentin, Plaintiff was incarcerated at the California Healthcare Facility ("CHCF") in Stockton, California. While CHCF was an improvement from San Quentin, Plaintiff continued to suffer

from his confinement and the deprivations therefrom. Most importantly, while the actual "death row" was closed, death sentences persisted; thus, Plaintiff still endured the psychological torture of having a capital sentence hanging over his head.

## CLAIMS FOR RELIEF

### CLAIM 1

### 42 U.S.C. § 1983 and *Monell*[3] Municipal Liability Against the County of Alameda for the Misconduct of the ACDAO and its Prosecutors

108. Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

109. At the time of Plaintiff's capital trial, as a criminal defendant, he was entitled to trial by an impartial jury of his peers, pursuant to the Sixth and Fourteenth Amendments to the United States Constitution.

110. The right to trial by an impartial jury prohibits the prosecution's use of peremptory challenges to eliminate jurors based on their inclusion in a protected class, including, inter alia, excluding jurors based on race, ethnicity, or gender.

111. The well-established rules regarding prosecutorial conduct in jury selection prohibited ACDAO prosecutors from removing a juror based on race, ethnicity, or gender.

112. Those who prosecuted Plaintiff's capital trial, including DDA Terese Drabec, violated these constitutional mandates.

113. As set forth above, Plaintiff's prosecutors targeted jurors based on their race, ethnicity, and religion, and eliminated four Black jurors based on their race.

114. The prosecution's jury selection notes establish that race was a consideration in these strikes, and that the prosecution was prepared to manipulate

---

[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94 (1978).

the jury to limit the number of Black jurors seated, and to mislead the court as to the reasons for removing Black jurors.

115. The prosecution's actions violated Plaintiff's constitutional right to a fair trial by an impartial jury, which directly contributed to the jury's guilt and penalty verdicts.

116. The above misconduct was a substantial cause of Plaintiff's unconstitutional injuries.

117. These violations of Plaintiff's constitutional rights were directly, foreseeably, proximately, and/or substantially caused by the unlawful administrative policies, customs, and/or practices of the ACDAO, as well as by the deliberate indifference of policymakers at that office, acting on behalf of the Defendant County, to the occurrence of such constitutional violations.

118. Under the principles of municipal liability for federal civil rights violations, at all relevant times, the District Attorney or his/her authorized delegates, had final managerial responsibility for establishing lawful policies of the office and for training, instructing, supervising, and disciplining attorneys and other employees of the ACDAO regarding their constitutional obligations.

119. Nevertheless, at the time of Plaintiff's trial, the ACDAO maintained unlawful policies, customs, and/or practices, and was deliberately indifferent to violations of fair trial rights, all of which were a substantial cause of both the violations of his constitutional rights and his damages.

120. Specifically, the ACDAO had an unlawful administrative policy, custom, and/or practice of automatically excluding Jewish and Black jurors from capital cases, in violation of the ACDAO's obligations under *Batson* and the United States Constitution.

121. The ACDAO had an unlawful administrative policy, custom, and/or practice of manipulating jury selection in order to mislead the court and defense counsel as to the real reasons for striking jurors.

122. The ACDAO had an unlawful administrative policy, custom, and/or practice of covering up these constitutional violations by providing false reasons for their strikes to the court and defense counsel.

123. The District Attorneys and their designees, as policymakers for the ACDAO and the County, encouraged such violations through their administrative policy, custom, and/or practice and deliberate indifference to constitutional rights.

124. The ACDAO and its policymakers had the opportunity to mitigate the harm to Plaintiff when these constitutional violations were revealed by a whistleblower in 2003, but chose to mislead the judicial inquiry into the matter rather than investigate and correct course. As a result of the ACDAO's orchestrated cover-up, Plaintiff spent more than two extra decades incarcerated on death row.

125. The aforesaid administrative policies, procedures, regulations, practices, and/or customs of the ACDAO were, collectively and individually, a substantial factor in bringing about the aforementioned violations of Plaintiff's rights under the Constitution and laws of the United States, and in causing his damages.

126. By virtue of the foregoing, the Defendant County is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. §1983, and his resultant injuries.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant County as follows:

1. Compensatory damages for the harms described above of not less than $100,000,000;
2. Reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988 and the inherent powers of this Court;
3. Pre-judgment interest as allowed by law; and
4. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby respectfully requests a trial by jury on all appropriate issues raised in this Complaint.

Dated: September 16, 2026

Respectfully submitted,

*/s/ Brian M. Pomerantz*
BRIAN M. POMERANTZ
ANN-KATHRYN TRIA

Attorneys for
MAURICE BOYETTE